# EXHIBIT "C"

# *American Law Enforcement Training and Consulting, LLC*

PO Box 4384 Wilmington, DE 19807- 4384

(302) 270-7043

g1.warren@comcast.net

www.americanletc.com

---

## Case Review and Expert Report

Prepared by

Dr. Gregory A. Warren, Captain – Delaware State Police (retired)

## On duty shooting death of Mr. David Jones by Philadelphia Police Officer Ryan Pownall on June 8, 2017

---

This analysis and subsequent report contain the professional opinions of the writer, as they relate to the study and review of the multiple documents made available in this case.  My conclusions are based upon a reasonable degree of certainty and drawn from over 35 years of professional law enforcement experience as a state trooper, law enforcement consultant and college professor. My experience includes but is not limited to, troop commander, director of training and section chief in a nationally accredited, state law enforcement agency, (Delaware State Police) and over 25 years of national law enforcement consulting experience. See below abbreviated CV section for further details, (Full CV available upon request). The information from which my conclusions are drawn includes, various audio and video tapes, photographs, Officer Involved Shooting Investigation section reports, sworn statements from multiple police officers including Defendant Ryan Pownall.  Philadelphia PD directives, multiple witness statements, and a wide variety of other miscellaneous reports. The review, analysis and conclusions expressed herein are based upon U.S. Supreme Court case law (Graham vs. Connor) and (Tennessee vs. Garner), Pennsylvania statutory law, The Commission on the Accreditation of Law Enforcement Agency's (CALEA) standards, Philadelphia Police Department policy and directives, and the International Association of Chiefs of Police (IACP) model policies.


_____                    _____

**Gregory A. Warren, Ed.D.**                                   **Date**

# Dr. Warren's abbreviated CV

Dr. Warren retired as a captain from the Delaware State Police after 22 years of service.

Dr. Warren fulfilled many roles while in the Delaware State Police, including patrol officer, shift commander, section chief, troop commander of the largest comprehensive troop in the state police and also director of training for the Division of State Police.

Dr. Warren was not only in charge of all State Police and municipal police training in Delaware, but was also the Administrator for the Delaware Council on Police Training before retiring in 2005.

While director of training his responsibilities included providing all Delaware State Troopers and municipal police officers in the State of Delaware with the following training: Basic academy training (short and long classes), in-service training for all DSP personnel, technical training for all police personnel, advanced training for all police personnel, all state police civilian personnel training, all comprehensive supervisory management and leadership training programs, K-9 training, special operations training, firearms training (both initial and in-service) and finally all police instructor certification training.

Dr. Warren authored the instructional text Police Academy: Training for 21st Century Law Enforcement.

Dr. Warren was the first person in Delaware certified as a Master Police Instructor and later authored the first police instructor certification training manual for Delaware.

Dr. Warren's doctoral dissertation was a validation study of the police basic training practices utilized by the Delaware State Police Academy and DE COPT as mandated by both statutory and administrative law in Delaware.

Dr. Warren has instructed thousands of police officers from almost every state in the U.S. including thousands of federal, state, county and municipal police officers, sheriff's deputies, and Department of Defense personnel.

Dr. Warren while with the Delaware State Police assisted in the development of and approval of many use of force course curriculums and lesson plans.

Dr. Warren has written and reviewed thousands of law enforcement and best police practices policies and procedures required for both state and national CALEA accreditation confirmation.

Dr. Warren taught as an adjunct faculty member at several area and regional colleges and Universities for over 23 years before becoming a fulltime program chair and faculty member at Wilmington University.

Dr. Warren is a 1993 graduate of Northwestern University's School of Police Staff and Command.

Dr. Warren has been a member of the American Society of Law Enforcement Trainers ("ASLET"), International Law Enforcement Education and Trainers Association ("ILEETA"), State Police and Provincial Academy Directors ("SPPAD"), International Association of State Directors of Law Enforcement Training ("IASDLET"), the Academy of Criminal Justice Sciences ("ACJS") and is currently a sitting member of the International Association of Chiefs of Police, Police Administration Committee, ("IACP").

Dr. Warren has taught hundreds of police officers, police supervisors and police instructors on how to design, develop and implement defensible police training practices and programs.

Dr. Warren is a certified law enforcement ethics instructor and has taught thousands of police officers in the field and collegiately in the classroom, in law enforcement ethics, de-escalation practices, and police professionalism.

Dr. Warren while an active duty state police supervisor, manager and commander either conducted personally or supervised hundreds of internal investigations involving Delaware State Troopers and municipal police officers from throughout the State of Delaware. He has also sat on or chaired multiple police trial boards for the Delaware State Police, municipal police agencies and for the Delaware Council on Police Training decertification board, involving various use of force and LE ethics issues.

Dr. Warren has also written and/or reviewed thousands of semi-annual and annual police performance appraisals involving police officer performance relevant to the use of force and various LE ethics and professionalism issues.

Dr. Warren retired from Wilmington University in 2019 as a full professor and chair of the graduate level Administration of Justice and Homeland Security programs.

Dr. Warren is a United States Department Justice State and Local Anti-terrorism program instructor.

Dr. Warren since 2012 has trained thousands of both LE personnel, teachers and citizens how to prevent and or respond to an active shooter or armed intruder event.

# Description of the incident

On Thursday, 6-8-17, at approximately 6:41PM, Officer Pownall, in uniform and assigned to RPC 1519, was transporting individuals to the Special Victims Unit at 300 E. Hunting Park Avenue. While stopped at the red light at Whitaker and Hunting Park Avenues, Officer Pownall observed a red motorcycle being operated by David Jones driving in a reckless manner. Officer Pownall observed the motorcycle stall on the sidewalk adjacent to the "El Casa De Espana" club located at 4210 Whitaker Avenue, and the officer stopped his patrol vehicle near David Jones. Officer Pownall exited his vehicle and attempted to question David Jones, and the male turned the right side of his body away from the officer and began holding the front of his waistband. Officer Pownall used his left hand to pat-down Jones and felt a firearm in his waistband. Officer Pownall drew his firearm and repeatedly told Jones not to touch the weapon. A struggle ensued between the two, and David Jones pulled a firearm from his waistband. Officer Pownall squeezed the trigger of his service pistol, and the weapon did not fire. The officer cleared a chambered round, and discharged three rounds at Jones as he ran south on Whitaker Avenue. Jones sustained gunshot wounds to the back and buttocks, and the male fell to the ground. David Jones was transported to Temple University Hospital and was pronounced deceased at 6:59PM.

Above account verbatim Per Philadelphia PD Investigation Report 8/10/17 by Det. Newell

# Additional Description of the Incident

Additional circumstances and observations involving this incident as derived from the study of all of the included documents involving this case are as follows:

1. Officer Pownall was transporting a father Terrance Freeman and his two children ages 9 and 11 in his marked patrol vehicle to a police facility nearby.

2. Mr. Jones was riding an illegal dirt bike on a public roadway and disregarding the commands of two police officers in a marked patrol vehicle to pull over in the same area as Officer Pownall, who was stopped waiting for a traffic signal to turn green.

3. The police officers attempting to pull over Mr. Jones decided to desist with their efforts to stop Mr. Jones and proceeded straight.

4. Mr. Jones at that time made several turning maneuvers and ended up stopping in a parking lot perpendicular to Officer Pownall's view at the traffic light, at which time Officer Pownall decided to pull across the on-coming lanes of traffic and cut Mr. Jones method of egress out of the parking lot off.

4

5. Officer Pownall in a marked patrol vehicle and in full uniform exited his vehicle and approached Mr. Jones.

6. Officer Pownall failed to call any of his actions or location in to the communications center.

7. Mr. Jones immediately becomes nervous and alarmed as Officer Pownall approaches, at which time he twists his upper torso to the right as to either conceal something or pull something concealed out of his clothing and/or waistband.

8. Officer Pownall seeing these movements on the part of Mr. Jones immediately suspects a weapon is concealed on Mr. Jones person and reacts accordingly by grabbing Mr. Jones.

9. Officer Pownall with his left hand can feel the outline of a handgun in Mr. Jones waistband and gives Mr. Jones several commands to cease resisting and struggling and states "don't do it" "don't do it"!

10. At this time the adult passenger being transported with his children in Officer Pownall's patrol vehicle witnesses the struggle for the weapon and also advises Mr. Jones "don't do it Bro" don't do it Bro".

11. Officer Pownall starts to lose physical control over Mr. Jones and the concealed weapon and in fear for his life pulls his issued sidearm and after again ordering Mr. Jones to cease struggling attempts to shoot Mr. Jones at which time his weapon misfires (failure to fire or dead round).

12. Officer Pownall as trained, immediately retreats as he simultaneously clears the malfunction by (tapping, tilting and racking) a new, live round into his firearm's chamber.

13. While conducting this movement, Officer Pownall loses sight of both Mr. Jones and his weapon.

14. As Officer Pownall comes back up on target, Mr. Jones is now back to Officer Pownall and attempting to run from the area of the officer.

15. Officer Pownall, not realizing that Mr. Jones has either dropped or thrown his weapon to his right rear believes Mr. Jones is still armed and now fleeing from his custody.

16. According to Officer Pownall's statement, he did not know if Mr. Jones would turn at any moment and fire towards him, or take cover behind the vehicle parked in front of the adjacent building and open fire at him or possibly even continue to flee the area, but possibly present an immediate threat to any citizens in the area or even other responding officers to this incident.

17. Officer Pownall takes aim at Mr. Jones and fires three rounds striking Mr. Jones twice at which time Mr. Jones goes down and is covered by Officer Pownall and other arriving officers.

18. Officer Pownall does not locate Mr. Jones weapon on or near Mr. Jones and immediately exclaims "he had a gun"! "he had a gun"!

19. Officer Pownall's passenger Mr. Freeman, who had witnessed a great deal of the unfolding events from the left rear passenger seat of the marked patrol vehicle (Chevrolet Tahoe) with his window partially down states to officers that the gun is on the ground several feet away from where the original struggle had ensued.

20. Upon checking, the stolen handgun was loaded with multiple rounds of live ammo.

21. Mr. Jones was rushed by police vehicle to Temple University Hospital where he was pronounced dead.

22. At that time the full investigation of this incident was initiated.

## Standards for Case/Incident Conclusions and Opinions

Pennsylvania Criminal Code denotes the use of deadly force by law enforcement ("LE") in the performance of their duties, including the arrest of subjects. Title 18 – Chapter 5, Section 508a. Use of Force in Law Enforcement, provides for duly appointed police officers to use deadly force when justified under varying circumstances.

**§ 508. Use of force in law enforcement.**

  **(a) Peace officer's use of force in making arrest** --

    (1)  A peace officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he believes to be necessary to effect the arrest and of any force which he believes to be necessary to defend himself or another from bodily harm while making the arrest. However, he is justified in using deadly force only when he believes that such force is necessary to prevent death or serious bodily injury to himself or such other person, or when he believes both that:

        (i)  such force is necessary to prevent the arrest from being defeated by resistance or escape; and

        (ii)  the person to be arrested has committed or attempted a forcible felony or is attempting to escape and possesses a deadly weapon, or otherwise indicates

that he will endanger human life or inflict serious bodily injury unless arrested
without delay.

The United States Supreme Court further expounds upon the topic of "excessive use of force" in
Graham vs. Connor, where the Court states that these types of cases should be reviewed and
analyzed as a reasonable police officer would have under the same circumstances.

Police best practices supports the implementation of the reasonable use of force as utilized by
police officers in various field situations. The Pennsylvania Commission on Municipal Police
Training mandates the basic training of all Pennsylvania police officers in the reasonable use of
force and the use of deadly force during their initial basic training at the Academy and again later
during their annual in-service training. Police officers in the Philadelphia Police Department
must also recertify not only in the actual use of their firearm on a live fire range, but also must
attend and satisfactorily complete various reality-based training scenarios on the use of deadly
force and how and when to best apply it.

Many members of SPADDS, IASDLET, ILEETA and the IACP, all now support the non-usage
of the typical "Use of Force Continuum", which for years was recognized as the standard by
which police should utilize various types of force when presented with different LE situations in
the field. As stated, many law enforcement agencies nationwide no longer utilize the traditional
"force continuum model" because of its restrictiveness and lack of impracticality in the field by
LE officers facing life or death situations with only milliseconds available with which to make a
decision.

In view of the information presented in the above section, the real, critical questions in this case
are then:

1. Was Officer Pownall in fear for his life or the life of others during his original encounter
   and struggle with Mr. Jones?

2. When Mr. Jones was fleeing away from Officer Pownall did Officer Pownall still believe
   his life or the life of others was in imminent serious danger or death?

If the answer to both of these questions is yes, then his shooting of Mr. Jones would have to be
ruled justified.

## Final Review and Analysis

During Officer Pownall's contact with Mr. Jones, it appears Officer Pownall made a "good
faith"" effort to keep from having to even engage physically with Mr. Jones by informing him
"I'm not going to take your shit" as he approached and attempted to calm Mr. Jones. As a result

of Mr. Jones turning from the officer and not only remaining non-compliant, but in fact engaging in threatening behavior, by apparently reaching for his concealed deadly weapon, Officer Pownall was forced by Mr. Jones threatening behavior to physically engage Mr. Jones and to try to subdue him physically or at least control the weapon Mr. Jones possessed, in an effort to ensure his own safety during this incident. However, as the investigation revealed, Mr. Jones was able to retrieve the weapon from his waistband at which time Officer Pownall reacted as his training would mandate and drew his service weapon in an effort to stop the immediate life-threatening activity engage in by Mr. Jones. Once this set of actions and reactions on the part of both adversarial parties began and escalated into a fight for life for Officer Pownall, we as reviewers cannot just stop the clock on the physical, mental, emotional and psychological state of both parties involved. The adrenaline rush felt by Officer Pownall and probably by Mr. Jones cannot just be turned off, with the hope that they can immediately revert back to a normal level of reasoning and objectivity. The physical effects of Officer Pownall losing some of his auditory ability and also his peripheral vision alone due to the adrenaline rush of an intense physical confrontation and then exasperated by his weapon misfiring, would cause him to become laser focused on the threat or perceived threat to both himself and others.

We cannot in good conscience judge each of Officer Pownall's actions at this point, as simple screen shots in time, because as we review this case we are now well after the fact and in the safety of our chosen surroundings, not forced to be cognizant of and deal with the exigent and extenuating circumstances which Officer Pownall faced on the date and time of this incident (June 8, 2017) while working in Philadelphia.


Some of the circumstances Officer Pownall faced just prior to and during this tragic event are as follows:

Officer Pownall observes a number of traffic violations being committed by Mr. Jones in his plain sight.

Officer Pownall, a duly sworn member of the Philadelphia Police Department has both a duty and right to investigate Mr. Jones actions and take necessary enforcement action if he so chooses.

Officer Pownall commands Mr. Jones to comply and not to reach for the gun any further at which time Mr. Jones fails to comply with the lawful order by a uniformed and easily identifiable police officer.

Officer Pownall does in fact see Mr. Jones' weapon coming out of his waistband.

Due to no fault of Officer Pownall, (clearing his misfired weapon) he loses momentary eye contact with the suspect, Mr. Jones.

8

When Officer Pownall regains sight of the suspect Mr. Jones, he is running away with his back towards Officer Pownall, where the officer cannot see Mr. Jones hands and thus Officer Pownall still believes Mr. Jones is armed with a hand gun. At this time Officer Pownall makes the split second decision to fire his weapon at Mr. Jones.

Possible reasons for Officer Pownall to legally fire his weapon at Mr. jones who was running away could fall under any one of the following three circumstances still existing

    a.  Mr. Jones could still turn at any second and fire at the officer or the passengers in his police vehicle which was right beside where he was standing.

    b.  Mr. Jones could be running to take cover behind the vehicle parked adjacent to this incident and then initiate an actual gun battle.

    c.  Officer Pownall may have believe that Mr. Jones could during his flight could intentionally hurt an innocent citizen in an effort to exit the area (i.e. carjacking) or fire at any other police officers responding to this scene once he calls in the incident.

Officer Pownall at this time still does not even know who Mr. Jones is, and as such there is no apparent ability to ever believe he will be able to catch or subdue Mr. Jones should he escape the scene.

Officer Pownall at this time does still not know for sure, if Mr. Jones had a second weapon in his possession as he is fleeing. Due to Mr. Jones immediately starting to struggle with Officer Pownall, Officer Pownall never had the chance to finish patting him down and or searching Mr. Jones for another weapon, either in Mr. Jones hoody pockets, or strapped to or taped to his leg for example.

Mr. Jones also helped further the deterioration of this incident by ignoring the lawful commands of Officer Pownall to stop resisting and become compliant and drop the gun or at least take his hands off of it.

Finally, after several warnings from Officer Pownall, Mr. Jones instead of becoming more cooperative tries to pull away harder and lift up and turn around farther away from Officer Pownall, thus taking what should have resulted in a typical stop and pat down activity for Officer Pownall and turned it into a situation where both Officer Pownall and Mr. Jones are now fighting for control of Mr. Jones concealed deadly weapon.

# Final Conclusions and Opinion

Based upon the information presented to me as a factual description of the circumstances surrounding this entire incident, I believe Officer Pownall displayed extremely poor judgment, a complete lack of concern for the safety of his passengers in his charge, failed to perceive all of the risks involved with his overzealous actions as a police officer and forced a very dangerous situation to become even more dangerous to all parties involved, by utilizing extremely poor officer safety tactics and failing to adhere to several different police policies, procedures, training protocols and police best practices. For example, engaging the suspect with passengers in his car, failing to identify himself officially, not utilizing appropriate patrol procedures and officer safety tactics, failing to use proper radio communications procedures, to even driving against oncoming traffic the wrong way, for what appears to be initially minor traffic violations.

However, the critical question at hand, is not whether Officer Pownall should have been disciplined, retrained, demoted or even terminated for his obvious lack of police professionalism, but whether he was justified in shooting Mr. Jones, as Mr. Jones had fought with Officer Pownall and was now fleeing from his custody and still refusing to abide by the officer's orders to drop the gun and comply. There are still unanswered questions which could provide more conclusive evidence as to how intense the struggle was between both parties, or why Mr. Jones refused to communicate with the original two officers following him and Officer Pownall, such as did Mr. Jones suffer from some type of hearing loss, does he have any type of mental or emotional disability, was he under the influence of any type of controlled dangerous substance etc.

Officer Pownall even warns Mr. Jones to comply before having to take additional action to bring this situation and Mr. Jones under control. Officer Pownall's options are limited as to what action he can take in this situation, due to Mr. Jones becoming more and more non-compliant. We must remember that Mr. Jones is young and in what appears to be good physical condition and quite capable of placing Officer Pownall in a life threatening struggle and is still continuing to fail to comply with Officer Pownall's requests, and is now in a full resisting arrest and physical altercation with Officer Pownall with the situation continuing to quickly escalate. Officer Pownall has been trained as police officer to react decisively and quickly in an effort to keep himself from being injured or killed by a suspect. In conclusion it was Mr. Jones' own actions which initiated the confrontation between he and Officer Pownall and thus his own actions assisted this situation in becoming a use of deadly force situation. Mr. Jones continued attempts to draw his concealed deadly weapon (handgun) and to remain non-compliant and engaging in life threatening behavior towards Officer Pownall which resulted in his death unfortunately.

In final conclusion, I believe Officer Pownall's poor judgement and over-zealous actions in this case placed all parties and bystanders in a very dangerous and precarious position and that Officer Pownall's behavior and actions were in violation of multiple Philadelphia Police Department policies and procedures, and were in complete defiance of multiple best practices in

law enforcement in the United States today, and thus resulted in the situation he and others are now faced with. However, with all of the facts presented in this case at this time, it is my professional opinion that Officer Pownall acted in accordance with the statuary laws of the State of Pennsylvania and also within the confines and structure of the U.S. Supreme Court's rulings on the use of deadly force by law enforcement officers. I therefore conclude Officer Pownall's use of deadly force in this case was justified.

