# EXHIBIT "D"

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROBERT WHARTON,** | |
| *Petitioner*, | **Civil Action** |
| *v.* | **No. 01-cv-6049** |
| **DONALD T. VAUGHN,** | |
| *Respondent.* | |

<u>**MEMORANDUM OPINION**</u>

**GOLDBERG, J.**                                          **September 12, 2022**

Trial courts and lawyers take direction from appellate judges. This is such a basic legal principle that no precedential or statutory citation is needed. As it relates to the federal habeas death penalty case before this Court, clear directives were issued by the United States Court of Appeals for the Third Circuit.

Approximately three years ago, the Third Circuit directed that a hearing be held to determine whether Petitioner Robert Wharton's trial counsel was ineffective under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Wharton alleged, with the District Attorney's Office now in agreement, that his Sixth Amendment rights were violated by his trial counsel's failure to investigate and present evidence of Wharton's positive adjustment to prison at the penalty phase of his homicide trial. <u>Wharton v. Vaughn</u>, 722 F. App'x 268, 280 (3d Cir. 2018). The Third Circuit directed that analysis of this <u>Strickland</u> claim should entail reconstructing the record to consider mitigation evidence not presented by trial counsel and that this hearing "<u>must</u> also take account of the anti-

1

mitigation evidence that the Commonwealth would have presented to rebut the petitioner's mitigation testimony." Id. at 283 (emphasis added). That court also ordered that the Strickland analysis be conducted "consistent with [its] opinion." Id. at 284.

In siding with Wharton that his requested relief was warranted, the District Attorney's Office has continually asserted that, despite specific guidance from the Third Circuit as to how Wharton's Sixth Amendment claim should be analyzed, it was free to concede relief and that a full exploration by the Court of all relevant facts was unnecessary.[1] But this position flatly contradicts unambiguous directives issued by the Pennsylvania Supreme Court regarding the handling of death penalty matters on collateral review. In Commonwealth v. Brown, 196 A.3d 130 (Pa. 2018), the Supreme Court spelled out its rejection, "in the strongest terms," of the District Attorney's position that it maintained authority, via a concession and stipulation, to undo a penalty of death on collateral review. Id. at 321. Brown's reasoning is easily understood and mandates that after a jury has imposed a sentence of death, affirmed on appellate review, the only way to vacate that verdict is through "appropriate" and "independent" judicial review—with the District Attorney's role in that process being limited to that of an "advoca[te]." Id. at 319-20. The Supreme Court admonished that if the District Attorney's concession were allowed to serve as the sole basis for undoing a verdict, "the power of a court [would] amount[] to nothing more than the power 'to do exactly

---

[1] See, e.g., ECF No. 278 at 22 ("[B]oth the federal and state courts regularly accepted the Commonwealth's concessions of death penalty relief, without conducting evidentiary hearings and without appointing a substitute prosecutor [i.e., the Attorney General's Office] to aggressively argue for death."); ECF No. 312 at 12 ("[P]arties often concede issues or arguments that narrow or preclude an evidentiary hearing."); N.T. 6/23/22 at 17 ("What the District Attorney's Office did was file a Notice that, after having reviewed the case, they agreed there was merit to the Defendant's Claim, having reviewed whatever evidence they had at that time, therefore consistent with what they'd been doing for years, before Larry Krasner was District Attorney, and while he was. They simply filed a Notice saying that's our position."); N.T. 6/23/22 at 19 ("That was their position. They did what Lawyers do all the time and said, under those circumstances, we agree with our Opponent. Lawyers do it in civil cases. They do it in criminal cases. It goes on all the time.").

what the parties tell it to do, simply because they [the District Attorney] said so and without any actual merits review[.]'" Id. at 325 (emphasis added). In short, Brown plainly holds that a jury's death sentence verdict cannot be undone until all facts are placed on the table so that a fully-informed judge, not the District Attorney, can make the decision as to whether a decades-old verdict should be set aside. Any suggestion that the Pennsylvania Supreme Court said anything different would be disingenuous.

Yet, in asking this Court to approve its concession in this matter, supervisors at the District Attorney's Office, following procedures implemented by the District Attorney, either ignored these precedential directives or, perhaps worse, intentionally chose not to follow them. And despite a clear order from the Third Circuit directing consideration of "anti-mitigation evidence" and an equally clear admonition from the Pennsylvania Supreme Court that unexplained concessions were frowned upon and that a "merits review" must occur, the District Attorney's Office failed to advise this Court that prison adjustment evidence in this case included significant anti-mitigation evidence involving Wharton's violent escape from a City Hall courtroom. Moreover, and according to its own (former) supervisor, the District Attorney's Office communicated to this Court in "vague" and unclear terms, "amenable" to misinterpretation, that the victim's family, including the only surviving victim, had approved of its concession, when in fact that was not the case. (ECF No. 287-1 ¶ 12.)

For these reasons, I am obligated to conclude that the Philadelphia District Attorney's Office and two of its supervisors violated Federal Rule of Civil Procedure 11(b)(3) based upon that Office's representations to this Court that lacked evidentiary support and were not in any way formed after "an inquiry reasonable under the circumstances."

I.    **BACKGROUND**

The sole remaining question in this case was fairly straightforward: Was Wharton's trial counsel's conduct in not investigating prison adjustment evidence at the penalty phase of Wharton's trial so deficient that, under Strickland v. Washington, 466 U.S. 688 (1984), there was a reasonable probability that at least one juror would have voted against imposing the death penalty. The District Attorney's litigation tactics in addressing this question are the subject of this opinion.

A full explanation of this Court's reasons for questioning the District Attorney's conduct is set out in my May 11, 2022 opinion and need not be repeated here. Briefly summarized, those concerns involved statements made by the District Attorney's Office regarding that Office's decision to concede relief on Wharton's last remaining habeas claim. The first representation was filed on February 6, 2019 through a "Notice of Concession of Penalty Phase Relief." This submission was signed by the Supervisor of the Federal Litigation Unit. There it was represented that the District Attorney's Office had decided to concede relief "[f]ollowing review of [the] case by" the Office's "Capital Case Review Committee" and "communication with the victims' family." (ECF No. 155.) The second representation was a proposed order submitted jointly by Wharton and the District Attorney's Office that stated that this Court had performed "a careful and independent review of all of the parties' submissions and all prior proceedings in this matter." (ECF No. 156-1.) Subsequently, in a brief filed April 3, 2019, the Office stated it had "carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfills the criteria articulated in Strickland v. Washington, 466 U.S. 668 (1984)." (ECF No. 162.)[2] (This brief was filed by the

_____

[2] In the first two pages of this filing, the District Attorney's Office outlines its obligation to "pursue justice" and to "change" course in death penalty collateral review matters (e.g., concede) at its own discretion. (ECF No. 162 at 1-2.) But as noted above, just a few months prior to this filing, the Pennsylvania Supreme Court in Brown rejected this discretion.

Supervisor of the Federal Litigation Unit and also named the Supervisor and Assistant Supervisor of the Law Division below the signature line.) That submission went on to recite "facts" that supported the Office's view that if prison adjustment evidence had been presented at the original sentencing hearing, a death sentence would not have been reached. (ECF No. 162 at 4.) Omitted from these facts, and indeed absent from any of these submissions, was any mention of Wharton's escape.

The present question is whether the District Attorney's Office, or any of its attorneys, should be sanctioned under Federal Rule of Civil Procedure 11(c) for making assertions in these submissions that lacked "evidentiary support" and which were not formed based on an "inquiry reasonable under the circumstances." See Fed. R. Civ. P. 11(b)(3). This issue overlaps with a lawyer's duty under the Rules of Professional Conduct to refrain from making assertions to the court on the lawyer's "own knowledge" unless the lawyer "knows the assertion[s] [are] true or believes [them] to be true on the basis of a reasonably diligent inquiry." Pa. Rule of Professional Conduct 3.3 cmt. 3; In re Price, 732 A.2d 599, 603 (Pa. 1999).

## II.  **SUMMARY OF THE SHOW-CAUSE HEARING TESTIMONY**

After raising concerns regarding the District Attorney's candor in the attempted concession process, a hearing was held to allow the District Attorney's Office, if it so chose, to offer explanations. Generally, the Office's outside counsel continually took the position that the District Attorney's Office was not obligated to explain its concession. (See, e.g., N.T. 6/23/22 at 11-12 ("[W]e don't think any explanation is necessary. … [W]e are not bringing [the attorneys] in to explain anything.").) Counsel also took the position that neither the Court, the victims, nor the public had a right to know why that Office decided to concede a decades-old verdict. (N.T. 6/23/22 at 37 (Q: "Don't you think the public has a right to know the deliberative process that the office made when

conceding a death penalty?" A: "Absolutely not.").) The Office relied, by analogy, to an exemption in the federal Freedom of Information Act for "deliberative" materials, which protects federal government agencies from having to "operate in a fishbowl." Assembly of the State of California v. Dep't of Commerce, 968 F.2d 916, 921 (9th Cir. 1992). Counsel also referenced, without specific citations, cases stating that a criminal defendant is not entitled to know the workings of a prosecutor's death penalty committee. Long speaking objections by counsel often preceded answers to the Court's questions. What little information the hearing did produce is summarized below.

The recommendation to concede Wharton's Strickland claim came from the District Attorney's Office's Capital Case Review Committee, which consisted of department supervisors. The Law Division Supervisor and Assistant Supervisor, both lawyers who litigated the remand hearings, were on this Committee, but the Supervisor of the Federal Litigation Unit, who actually signed and filed the Notice of Concession and follow-up documents relating to the concession, was not. The Committee delivered its recommendation to the District Attorney, who made the decision to concede. (N.T. 6/23/22 at 24, 42, 60.)

The Law Division Supervisor and Assistant Supervisor, both experienced attorneys, testified that they recommended conceding Wharton's habeas petition without knowing or attempting to know that Wharton had escaped from a City Hall courtroom. (N.T. 6/23/22 at 27, 34, 40, 61.) The Law Division Supervisor did not know whether any other member of the Committee was aware of Wharton's escape while discussing the concession. (N.T. 6/23/22 at 41-42) The Assistant Supervisor's memory was that no one on the Committee was aware of the escape before the concession recommendation was relayed to the District Attorney. (N.T. 6/23/22 at 61-62 (Q: "Was anyone on the Committee aware?" A: "I don't believe so.").) When the Law Division Supervisor was asked whether it would have been appropriate for a judge to sign the order proposed by the

6

District Attorney stating that the Court had performed a "careful and independent review" while not knowing of Wharton's escape, she responded that she could not "answer that question for the Court." (N.T. 6/23/22 at 59.) As noted above, counsel for the Office continually objected to any questioning into "deliberative" matters, and thus the show-cause hearing shed little light as to why the Office either did not consider Wharton's escape or, if it was considered, how that Office concluded that Wharton's adjustment to prison was sufficiently positive to merit relief under <u>Strickland</u>.

The District Attorney's supervisors' testimony that they were unaware of the escape before recommending concession was curiously contrary to what had previously been communicated to this Court. On May 11, 2021, at the remand hearing on Wharton's habeas petition, this Court directly asked the Assistant Supervisor whether the District Attorney's Office was aware of Wharton's escape conviction before making the decision to concede Wharton's <u>Strickland</u> claim. Without any explanation or elaboration, he responded "yes." (N.T. 5/11/21 at 66.) That same attorney was asked at the June 23, 2022 show-cause hearing to reconcile this answer with his newfound position that no one on the Committee was aware of Wharton's escape before recommending concession. The Assistant Supervisor responded that his prior affirmative answer was only meant to convey that the District Attorney's Office "as an entity" (e.g., the Office as configured thirty years ago) was aware of the escape but that no one on the Committee that recommended the concession in question was aware of it. (N.T. 6/23/22 at 75-77.)

An affidavit submitted before the show-cause hearing by the Supervisor of the Federal Litigation Unit who submitted the concession sheds considerable light on the District Attorney's litigation conduct in this case. (ECF No. 287-1.) That Supervisor stated that he signed the Notice of Concession despite having no knowledge of the basis for the concession and despite having

undertaken no investigation. (ECF No. 287-1 ¶¶ 5, 8, 10-11.) When asked why the task of signing the Notice of Concession on behalf of the Office was given to a lawyer with no knowledge of why the concession was being submitted, the Law Division Supervisor responded only that this was the Office's "normal practice" and that other administrations had followed the same procedure. (N.T. 6/23/22 at 24, 51-53.) When pressed to explain why the Court was not advised of the escape, the Law Division Supervisor stated, "[W]e didn't tell you anything. And it isn't a question of with-holding. This is a question of our practice, our practice." (N.T. 6/23/22 at 25.)

Regarding the District Attorney's Office's statement that its concession was made "[f]ollowing … communication with the victims' family," the Federal Litigation Supervisor who signed the concession explained in his affidavit that he did not mean to imply that the family had been consulted prior to the Office's decision or that all members of the family had been contacted. Rather, he intended only to convey that the family had been informed of the outcome of the Office's decision—that is, they had been told the Office would concede. This supervisor acknowledged that his statement regarding "communication with the victims' family" was "vague," "lack[ed] … clarity," and was "amenable to the interpretation that the victims' family agreed with the concession of penalty phase relief." He also apologized for his lack of clarity. (ECF No. 281-1 ¶ 12.) The Supervisor of the Law Division also recognized the Office's misstep in not notifying the only surviving victim of Wharton's crimes that the District Attorney would be seeking a concession. She stated that victim communication was not her responsibility and acknowledged that contacting that victim was "something we should have done. We recognize our mistake." (N.T. 6/23/22 at 48.)

### III. <u>LEGAL STANDARD: FEDERAL RULE OF CIVIL PROCEDURE 11</u>

Rule 11(b) imposes three duties relevant here: the duty to conduct an "inquiry reasonable under the circumstances" before filing a paper with the Court, 11(b); the duty not to make filings for "any improper purpose," 11(b)(1); and the duty to refrain from asserting "factual contentions" that lack "evidentiary support," 11(b)(3). Although Rule 11 does not include all aspects of the ethical duty of candor to the Court, that obligation informs Rule 11's prohibition on making unsupported factual contentions. <u>See</u> Notes of the Advisory Committee on the 1993 Amendment (Rule 11 "emphasizes the duty of candor … ."); <u>Presidential Lake Fire & Rescue Squad, Inc. v. Doherty</u>, No. 12-cv-5621, 2014 WL 318330, at *5-6 (D.N.J. Jan. 29, 2014) (using Rule of Professional Conduct 3.3(a) to inform the Rule 11 analysis).

"The legal standard to be applied when evaluating conduct allegedly violative of Rule 11 is reasonableness under the circumstances … ." <u>Ford Motor Co. v. Summit Motor Products, Inc.</u>, 930 F.2d 277, 289 (3d Cir. 1991).[3] Regarding the duty to refrain from making factual assertions that lack "evidentiary support," the question is whether the filer had "an objective knowledge or belief at the time of the filing of a challenged paper that the claim was well-grounded in law and fact." <u>Ford Motor Co.</u>, 930 F.2d at 289 (quotation marks omitted). "A court should test the signer's conduct by inquiring what was reasonable for the signer to believe at the time the pleading was submitted." <u>New Life Homecare, Inc. v. Blue Cross of Northeastern Pa.</u>, No. 06-cv-2485, 2008 WL 534472, at *2 (M.D. Pa. Feb. 20, 2008). Rule 11 "does not recognize a 'pure heart and empty

---

[3] With respect to the duty to conduct a pre-filing inquiry, four factors typically relevant in assessing whether the signer's inquiry was adequate are: "the amount of time available to the signer for conducting the factual and legal investigation; the necessity for reliance on a client for the underlying factual information; the plausibility of the legal position advocated; and whether the case was referred to the signer by another member of the Bar." <u>Mary Ann Pensiero, Inc. v. Lingle</u>, 847 F.2d 90, 95 (3d Cir. 1988). Of these factors, reliance on the client and referral by another member of the bar are not applicable here.

head' defense." <u>In re Cendant Corp. Derivative Action Litig.</u>, 96 F. Supp. 2d 403, 405 (D.N.J. 2000).

"If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). "Generally, sanctions are prescribed only in the exceptional circumstance where a claim or motion is patently unmeritorious or frivolous," and even a "tenuous[] factual basis" may suffice to comply with the Rule. <u>Ford Motor Co.</u>, 930 F.2d at 289-90. "[W]here such exceptional circumstances exist, the court is merely authorized, not required, to impose sanctions." <u>Pet Gifts USA, LLC v. Imagine This Company, LLC</u>, No. 14-cv-3884, 2019 WL 3208512, at *2 (D.N.J. July 15, 2019). Sua sponte sanctions are ordinarily reserved for "only the most egregious cases." <u>Kovarik v. South Annville Township</u>, No. 17-cv-97, 2018 WL 1428293, at *17 (M.D. Pa. March 22, 2018).

## IV.   <u>DISCUSSION OF REPRESENTATIONS IN THE DISTRICT ATTORNEY'S OF-FICE'S FILINGS</u>

### A.   Was a "reasonable inquiry" undertaken before the District Attorney's Office represented that it had conducted a careful review of the facts pertaining to Wharton's <u>Strickland</u> Claim?

As noted previously, the District Attorney's Office submitted the following filings that qualify as "other paper[s]" under Rule 11(b): (1) the "NOTICE OF CONCESSION OF PENALTY PHASE RELIEF," filed on February 6, 2019, stating:

> Following review of this case by the Capital Case Review Committee of the Phila-delphia District Attorney's Office, communication with the victim's family, and no-tice to petitioner's counsel, respondent hereby reports to the Court that it concedes relief on petitioner's remaining claim of ineffective assistance at the second penalty hearing, and does not contest the grant of a conditional writ of habeas corpus with respect to petitioner's death sentences.

(ECF No. 155,) (2) a Proposed Order, filed on February 8, 2019 and submitted by counsel for Wharton and the District Attorney's Office indicating the Court had undertaken "a careful and independent review" (ECF No. 156); and (3) a brief, filed on April 3, 2019 which stated that the Office had "carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfill[ed] the criteria articulated in Strickland v. Washington, 466 U.S. 668 (1984)." (ECF No. 162 (emphasis added).) This last submission also stated that the Office "determined that Wharton's remaining habeas claim—that his counsel was ineffective at his second penalty hearing for not investigating and presenting evidence of his adjustment to prison—is not lacking in merit." (Id.)[4]

Despite clear instructions from the Third Circuit that anti-mitigation evidence must be considered and the Pennsylvania Supreme Court's edict that a death penalty verdict on collateral review can only be vacated after appropriate judicial review of the merits of the claim, none of these filings contained any mention of possibly the worst type of prison adjustment—a violent escape from City Hall in 1986 and subsequent escape conviction. Under these particular circumstances, the Court concludes that the District Attorney's Office's representation that they had "carefully reviewed the facts" was unreasonable, as was its request that the Court sign an order indicating that a "careful review" had occurred. In short, in light of the Sixth Amendment issue before the Court, not identifying Wharton's escape cannot, under any circumstances, constitute a "reasonable

---

[4] The District Attorney's Office argues that representations in this brief should be ignored because it was filed in response to an order calling for a legal analysis of the weight to be afforded the Office's concession. The Court disagrees. Even assuming the Office could somehow have responded to this Court's order without citing facts, the District Attorney's Office not only volunteered facts but used them to argue that its concession reflected "considered judgment" and was entitled to "great weight" such that a court "may … accept" it. (ECF No. 162 at 5.) Having offered its "careful[] review[]" finding "merit" to Wharton's Strickland claim as a basis for its requested relief, the District Attorney's Office cannot now claim that these representations were irrelevant.

inquiry," nor do these factual representations have any evidentiary support. Ironically, the District Attorney's Office advocates that Wharton's death sentence be vacated because trial counsel failed to investigate prison adjustment, yet the District Attorney's Office failed to do the same.

The District Attorney's Office offers numerous and wide-ranging explanations for its conduct. The first is that its statement that Wharton's <u>Strickland</u> claim was meritorious was a legal position, not a factual representation. But the language of its concession, proposed order, and brief says otherwise: That Office represented that it had performed a "careful[] review[]," which was a factual statement. Any "careful[] review[]" must, as the Third Circuit directed, have included examination of possible negative prison adjustment evidence, and discovery of Wharton's escape could have easily been undertaken.[5] In fact, according to the logic of the Assistant Supervisor, that Office, "as an entity" was aware of the escape. But no matter which version is accepted, the fact remains that the District Attorney's Office failed to alert the Court to such powerful anti-mitigation evidence.

The Office's statement that it had "carefully reviewed" this matter and found that Wharton's <u>Strickland</u> claim was meritorious unmistakably represented that the Office had found no facts that would lead any reasonable judge to reject the claim. In particular, the Office's citation in its brief to two specific facts supporting <u>Strickland</u>'s prejudice prong implied that those facts were significant in the context of its "careful[] review[]"—or, at least, not overwhelmed by other undisclosed facts. The American Bar Association has recognized that "[i]n light of the prosecutor's public responsibilities, broad authority and discretion, the prosecutor has a heightened duty of candor

---

[5] The Attorney General's Office became aware of Wharton's escape through a simple review of Wharton's criminal history, which included a conviction for escape. (<u>See</u> ECF No. 311.)

to the courts … ." American Bar Association, Standards for the Prosecution Function § 3-1.4. Accordingly, when a prosecutor concedes relief and supplies certain facts "to [a] court[]," there is an implied representation that the prosecutor's basis for its position was made after a "reasonable inquiry," is fully informed, and is not misleading.

The District Attorney's Office continues to press that although it is a public, prosecuting office, a heightened duty of candor does not apply to its communications with the Court. The Office asserts that this heightened duty only applies to disclosures to the defense of exculpatory facts under Brady v. Maryland, 373 U.S. 83 (1963), and Pennsylvania Rule of Professional Conduct 3.8(d). (ECF No. 300-1 at 16.) The Court disagrees.

Not surprisingly, authority is sparse on the ethical duties of prosecutors who advocate, as the District Attorney did here, for death penalty relief on behalf of a defendant on habeas review. But an analogous situation occurs when a prosecutor and defense counsel jointly recommend a sentence that is favorable to a defendant. Under those circumstances, the prosecutor may not withhold relevant information from the sentencing court even where a favorable agreement has been reached with a defendant, and even if such information is adverse to the defendant. See United States v. Casillas, 853 F.3d 215, 218 (5th Cir. 2017); Bruce A. Green, Candor in Criminal Advocacy?, 44 Hofstra L. Rev. 1105, 1124 (2016). The Fifth Circuit's reasoning squarely applies here: "[I]f an attorney for the Government is aware that the court lacks certain relevant factual information or that the court is laboring under mistaken premises, the attorney, as a prosecutor and officer of the court, … has the duty to bring the correct state of affairs to the attention of the court." United States v. Block, 660 F.2d 1086, 1091 (5th Cir. 1981). Failing to disclose these facts lacks candor because "the public has an interest in the decision being informed by knowledge of the

provable facts that are likely to matter," Green, <u>supra</u>, at 1124, and because nondisclosure "improperly undercut[s] the sentencing court's role." <u>United States v. Aragon</u>, 922 F.3d 1102, 1116 (10th Cir. 2019) (Holmes, J., concurring). A private concession by a prosecutor that produces no public record justifying relief is "reminiscent of the Star-Chamber." <u>Brown</u>, 196 A.3d at 146.

Even after the highest Pennsylvania court, which the District Attorney routinely appears before, spelled out in clear terms the proper process in collateral death penalty matters, the District Attorney's Office continues to misunderstand its role. As the Pennsylvania Supreme Court explained in <u>Brown</u>, when a habeas petitioner and a prosecutor jointly request that a sentence be overturned, they are asking the Court to use its power to bring about a change neither party itself, nor both acting together, can accomplish. If the District Attorney's Office files its concession on a misleading presentation of the facts, it attempts to misuse the Court's power, which is an "improper purpose" under Rule 11(b)(1).

In a further attempt to justify its conduct, the District Attorney's Office also disagrees with the suggestion that the agreement it reached with Wharton's counsel, and the lack of adversity it thereby created, heightened their duty to be candid (and "careful[]") about facts that might preclude relief. The District Attorney's Office makes the perplexing argument that even after its concession, the proceeding remained adversarial because Wharton was also a party to it. (ECF No. 300-1 at 19.)

While the facts and posture of this case are unique, courts have recognized analogous situations in which a joint or unopposed request carries a similar affirmative duty to inform the court of adverse facts as exists in <u>ex parte</u> proceedings: (1) when a prosecutor and defense attorney jointly recommend a sentence, <u>United States v. Block</u>, 660 F.2d 1086, 1091 (5th Cir. 1981); (2) when a prosecutor asks a judge to dismiss a case, <u>In re Kress</u>, 608 A.2d 328, 337 (N.J. 1992); (3)

when a class action named plaintiff and a defendant jointly propose a settlement, <u>Arkansas Teach-ers Retirement System v. State Street Bank & Trust Co.</u>, 512 F. Supp. 3d 196, 208 (D. Mass. 2020); and (4) when a court-appointed agent requests fees. <u>Eagan ex rel. Eagan v. Jackson</u>, 855 F. Supp. 765, 790 (E.D. Pa. 1994). These situations have the following attributes in common: (1) the parties seek relief they cannot achieve through private agreement; (2) failing to disclose adverse facts results in a transfer of decision-making authority from the court to the parties, <u>see Aragon</u>, 922 F.3d at 1115-16 (Holmes, J., concurring); and (3) the adversarial system is inadequate to prevent abuse. All of those attributes are present here. As a consequence, the District Attorney's Office's statement that its careful review found merit to Wharton's <u>Strickland</u> claim contained an implied representation, subject to Rule 11(b)(3), that the District Attorney's Office was not aware of any significant, contrary facts that would lead any reasonable judge to deny the requested relief.

While Wharton's habeas proceeding had only two formal parties, the Court also disagrees with the District Attorney's outside counsel that there were no other interests at play in understand-ing why relief was conceded. The public had an "interest that a result be reached which promotes a well-ordered society," which "is foremost in every criminal proceeding." <u>Young v. United States</u>, 315 U.S. 257, 259 (1942). The victim and the victim's family had a right to clear communication and had an interest in being heard and treated with fairness and respect. 18 U.S.C. § 3771(b)(2)(A). And the state had an interest in having its judgments set aside only "upon proper constitutional grounds" rather than the concession of an "elected legal officer of one political subdivision within the State." <u>Sibron v. New York</u> 392 U.S. 40, 58 (1968); <u>see also</u> <u>Carter v. City of Philadelphia</u>, 181 F.3d 339, 349 (3d Cir. 1999) ("Pennsylvania's case law defines district attorneys—Philadelphia

District Attorneys in particular—as local, and expressly <u>not</u> state, officials."); <u>United States v. Bendolph</u>, 409 F.3d 155, 166 (3d Cir. 2005) (Congress did not "intend[] to relegate the efficacy of its reforms [in 18 U.S.C. § 2254] to the vagaries of a prosecutor's decisions or mistakes.").

The last of those three interests—deference to final state court judgments—deserves special consideration. While there are no specific ethical rules in habeas corpus proceedings, there are unique opportunities for abuse that have come to light here. The state of Pennsylvania does not afford the Philadelphia District Attorney's Office discretion to set aside a death sentence once imposed. <u>Brown</u>, 196 A.3d at 149. The state's justifications for that rule are numerous and include that past sentences cannot be left to "the changing tides of the election cycles." <u>Id.</u> Pennsylvania is entitled to limit the District Attorney's discretion in this manner because "States retain autonomy to establish their own governmental processes," <u>Arizona State Legislature v. Arizona Indep. Redistricting Comm'n</u>, 576 U.S. 787, 816 (2015), and "State[s] … ha[ve] … flexibility in deciding what procedures are needed in the context of postconviction relief." <u>Dist. Attorney's Off. for Third Jud. Dist. v. Osborne</u>, 557 U.S. 52, 69 (2009).

As it relates to Rule 11, a prosecutor may not avoid those restrictions by submitting only selected facts to a federal court. This is because federal habeas jurisdiction is premised on the existence of a federal question. <u>Mason v. Myers</u>, 208 F.3d 414, 417 n.6 (3d Cir. 2000). If the federal court is unaware that the presentation is misleading, it cannot enforce the limits of its own jurisdiction, which is particularly important when the court has been asked to issue the "extraordinary remedy" of habeas corpus. <u>See</u> <u>Hensley v. Municipal Court</u>, 411 U.S. 345, 351 (1973).

Here, were it not for the assistance of the Attorney General, there was a risk that this Court may have ordered habeas relief that, under the law, it had no power to grant—a risk that heightened the District Attorney's Office's duty to conduct a reasonable inquiry before requesting relief. Put

another way, had this Court simply accepted the concession, and the public and victims later learned of the escape, the Court's statement that it had "carefully" reviewed the matter could rightfully be called into question, as would the public's trust in the legal process. Apparently in its zeal to overturn a jury's death sentence, the District Attorney's Office did not bother to take this factor into account.

The District Attorney's Office offers yet another justification for its conduct by noting that judges in this District have frequently granted its requests to concede habeas relief. The routine use of concessions in federal court to modify state sentences without a merits review might be tolerable if it were a permissible exercise of discretion. But where it is a discretion <u>forbidden</u> in the "strongest terms," <u>Brown</u>, 196 A.3d at 146, a concern emerges that these concessions serve an improper purpose. <u>Cf.</u> <u>Lambrix v. Singletary</u>, 520 U.S. 518, 525 (1997) ("A State's procedural rules are of vital importance to the orderly administration of its criminal courts; when a federal court permits them to be readily evaded, it undermines the criminal justice system.").

The District Attorney's Office lastly claims that it never opposed the development of facts regarding Wharton's habeas petition. (ECF No. 300-1 at 5-6; N.T., 6/23/22, 17-18.) That response is not credible. The Office had an opportunity to develop the facts when remand was ordered but chose to only put before the Court a concession based upon limited selected facts. The District Attorney's Office may have also forgotten that it objected to the Attorney General's Office's conducting a "factual investigation," "calling witnesses," "introducing evidence," and "develop[ing]

17

a factual record." (ECF No. 226 at 5, 7-8.) And in post-hearing briefing, in objecting to the Attorney General's participation, the District Attorney's Office called the use of the Attorney General's Office as an amicus to complete the record "unprecedented."[6]

Given all of the above, the Court concludes that the District Attorney's Office's representation that it had conducted a careful factual review and found merit to Wharton's <u>Strickland</u> claim lacked an "evidentiary basis" as required by Rule 11. Two key members of the Committee that conducted the purported review claimed that they were unaware that Wharton's "prison adjustment evidence" included evidence of an escape attempt. This information was available in Wharton's criminal history as a conviction for "escape." Whatever review the Committee performed, it was either not of the merits or was not "careful."

The Court also finds that the District Attorney's Office represented that Wharton's <u>Strickland</u> claim was meritorious without conducting an "inquiry reasonable under the circumstances." Wharton's escape attempt resulted in a conviction that appears on his criminal history, which can be found simply by typing Wharton's name into Pennsylvania's Unified Judicial System Web Portal to reveal a conviction for "ESCAPE." Yet two supervisors on the Committee that recommended conceding Wharton's habeas petition testified that they were unaware of the escape attempt at the time and did not know whether the District Attorney, who approved the concession, was aware of it. That two experienced attorneys recommended taking the extraordinary step of attempting to vacate a decades-old death penalty sentence without examining Wharton's criminal history is a matter of inter-office process. But to then ask a court to approve such extraordinary relief based

---

[6] The Attorney General's Office was also invited by the Pennsylvania Supreme Court to participate as an amicus in <u>Brown</u>. <u>See</u> 196 A.3d at 142).

on such a patently deficient inquiry is not "reasonable under the circumstances" and implicates the submission requirements of the Federal Rules of Civil Procedure.

Rule 11 also instructs that the "circumstances" at play be considered. Under the circumstances of this case, it cannot be ignored that the underlying facts involved the brutal murder of two parents and an infant left by Wharton to freeze to death who miraculously survived. Under these circumstances, and given the death sentences that followed, the District Attorney's Office's failure to more carefully review this matter before involving the Court further implicates Rule 11. In failing to conduct the required "inquiry reasonable under the circumstances," the supervisors on the Committee and District Attorney's Office violated Rule 11.

### B.      Communication with the Victims' Family

The District Attorney's Office also represented that its concession was made "[f]ollowing … communication with the victims' family." The supervising attorney who signed this statement explained that he did not mean to say that the victims' family had been consulted prior to the decision or that they agreed with that concession. Rather, he meant only that the decision to concede had been communicated to the victims' family after it was made. (ECF No. 287-1 ¶ 12.) But that same supervising attorney acknowledged that this submission to the Court made on behalf of the District Attorney's Office was susceptible to the interpretation that the victims' family had been consulted and that they concurred in the outcome, which was not true. The supervising attorney also admitted that his communication lacked clarity and was vague.

As to the intended assertion—that the victims' family had been notified of the planned concession—the Supervisor of the Federal Litigation Unit who was the signing attorney arrived at this understanding through conversations with the Office's Victim Witness Coordinator. But somehow this conversation failed to convey to him that only one family member had been contacted,

19

and that the sole surviving victim, Lisa Hart-Newman, had never been contacted. Both he and the Victim Witness Coordinator were therefore unaware that several family members, including Lisa Hart-Newman, would have been vehemently opposed to the concession had they been informed of it.

This Court (which only learned of the family's opposition through the Attorney General's Office) is not the only one who considered the District Attorney's representations misleading. Lisa Hart-Newman, the infant, now age thirty-seven, who was left to die by Wharton after her parents were murdered, stated she was "extremely disappointed to learn of the District Attorney's stance and very troubled that he implied that the family approved of his viewpoint." (ECF No. 171-5 at 16.) Michael Allen, one of the brothers of the deceased, also noted, "[I]t would appear that there was a substantially deficient briefing by the DA's office regarding the significance and implications for vacating Wharton's death penalty." (Id. at 17.)

Accordingly, the Court finds that the District Attorney's Office's statement regarding its communication with the victims' family was false and yet another representation to the Court made after an inquiry that was not reasonable under the circumstances. The supervising attorney who made this representation did so at the direction of his supervisors, was not personally aware of the error, and has apologized for this miscommunication.

## V.    VIOLATION AND SANCTIONS

The Supervisor of Federal Litigation filed the Notice of Concession and signed the other submitted documents in question. With respect to his statement that the Office had "carefully reviewed the facts" in determining that Wharton's ineffectiveness claim fulfilled the Strickland standard, I credit his explanation that he relied solely on communications from supervisors that a careful review had actually been conducted. He also explained that he had no input regarding the

decision to concede and no authority to ask the Capital Case Review Committee to reconsider its decision. In filing the Notice of Concession, he followed the directive of the Assistant Supervisor of the Law Division and the Office's procedures.

Rule 11 does not preclude the signer from relying on information from other persons. See Garr v. U.S. Healthcare, Inc., 22 F.3d 1274, 1278-79 (3d Cir. 1994). Comment 1 to Pennsylvania Rule of Professional Conduct 5.2 is informative and instructs that "if a subordinate filed a frivolous pleading at the direction of a supervisor, the subordinate would not be guilty of a professional violation unless the subordinate knew of the document's frivolous character." See also Pa. RPC 5.2 cmt. 2 (when reasonable to do so, a lawyer may take direction from a supervisor so that the office can follow a "consistent course of action").

While a deeper inquiry on the part of Federal Litigation Supervisor would have been preferable, it was not "patently … frivolous" for this lawyer to assume that the highly experienced attorneys on the Capital Case Review Committee and the District Attorney himself had performed a sufficient investigation before directing that a concession in a death penalty case be filed. This same attorney also acted with candor and contrition in acknowledging that his statement regarding communication with the victims' family was unclear and susceptible to a misleading interpretation and has apologized for this mistake. Compare Dr. Pepper Bottling Co. of Texas v. Del Monte Corp., No. 88-cv-3012, 1992 WL 438013, at *1 (N.D. Tex. Jan. 7, 1993) (declining to issue further sanctions based on "the forthright contrition and recognition of error expressed by [the attorney] in his affidavit"), with Milani v. International Business Machines Corp., No. 02-cv-3346, 2004 WL 3068451, at *2 (S.D.N.Y. Dec. 30, 2004) (imposing sanctions in part based on the attorney's "utter lack of contrition[] or even regret"). For these reasons, the Court does not find that the Federal Litigation Supervisor violated Rule 11.

The Court reluctantly concludes that a different view must be taken regarding the Law Division Supervisor and Assistant Supervisor, both of whom were on the Capital Case Review Committee. The Assistant Supervisor directed the Federal Litigation Supervisor to file the Notice of Concession, and both the Law Division Supervisor and Assistant Supervisor had their names included on the brief representing that the Committee had "carefully" reviewed Wharton's <u>Strickland</u> claim. The District Attorney's Office's conduct as a whole must also be considered, as Rule 11 directs that sanctions may be imposed on parties and law firms when these entities are "responsible for [a] violation" of the Rule. <u>See</u> Fed. R. Civ. P. 11(c)(1).

As leaders of the Office's Division that oversees the "Law," and who presumably provide advice and analysis on controlling precedent to the District Attorney, the Supervisor and Assistant Supervisor must have been aware that <u>Strickland</u>'s prejudice prong required an assessment of mitigation evidence not presented by trial counsel in conjunction with possible anti-mitigation evidence. <u>See</u> <u>Wharton</u>, 722 F. App'x at 283 ("[W]e must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the petitioner's mitigation testimony."). They were also well aware that recent Pennsylvania Supreme Court precedent mandated that a full development of the facts be undertaken before relief could be granted. Yet the District Attorney's Office, through these supervisors, directed representations to the Court that the Office had "carefully reviewed the facts" when in fact that did not occur. The assertion that a careful review had been conducted by the committee is irreconcilable with the testimony of two supervisors involved in the review that they were ignorant of Wharton's escape attempt. And it is worth repeating that the Court afforded these supervisors the opportunity to explain how their review of

the facts was "careful[]," yet at that hearing, their counsel referred to a deliberative process privilege and engaged in long speaking objections, which at times suggested answers, such that little information was obtained.

The close timing between the Pennsylvania Supreme Court's ruling in <u>Brown</u> that the District Attorney's Office does not have discretion to concede a death penalty sentence on collateral review absent a full exploration of facts and the Office's strategy of doing exactly that in this case only exacerbates this situation. The <u>Brown</u> decision was issued just four months before the Office's concession here, and counsel of record in <u>Brown</u> was the Assistant Supervisor who was also on the Committee that recommended conceding Wharton's federal habeas petition. In <u>Brown</u>, The District Attorney's Office attempted to reverse years of support for a jury's verdict through a "newfound agreement" with no substantive factual reasons. The same tactic was attempted in this federal case. In both cases, the Office sought to use prosecutorial discretion as a "substitute for independent judicial review." These parallels suggest an "improper purpose" for the District Attorney's Office's concession in this case, namely an attempt to circumvent <u>Brown</u> in a forum that may be unfamiliar with its strictures. A reasonable response to these concerns would have been to follow <u>Brown</u> and present all necessary facts to this Court, or at the very least, to acknowledge missteps made and provide assurances that the Office would not misuse federal jurisdiction to evade state law. Instead, the Office's supervisors were reluctant to explain their actions and offered little acknowledgment of <u>Brown</u> or that their failure to advise of Wharton's escape should have been handled with more candor.

As to the assertion that the Office had decided to concede following "communication with the victims' family," this statement gave the impression that the Office had conferred with the family before making the decision to concede and that the family either agreed with the decision

23

or did not object to it. In fact, the only communication was to inform a single family member that the Office was considering conceding. None of the family members supported the Office's decision to concede, and several expressed shock and indignation that the District Attorney's Office had suggested otherwise. While the Court declines to sanction the signing attorney, no similar justifications excuse the District Attorney's Office as a whole for so carelessly invoking its communications with the victims' family as support for its concession while, at the same time, making only a cursory effort to contact them and no effort to consider their views. The Law Division Supervisor could give no justification for why communication with the surviving victim and her family was handled in this manner other than to say that victim communication was not her responsibility and the Office made a "mistake." (N.T. 6/23/22 at 48.)

In contrast to the regret demonstrated by the (now former) Supervisor of the Federal Litigation Unit, the District Attorney's Office has steadfastly insisted that it has done nothing wrong, owes no explanation, and will provide none. (N.T. 6/23/22 at 11-12.) Cf. Ivy v. Kimbrough, 115 F.3d 550, 553 (8th Cir. 1997) (affirming sanctions where the "response to the court's order to show cause regarding sanctions was so superficial as to be insulting to the court and to the policies underlying Rule 11"). A glaring example of this continued tactic is the Assistant Supervisor's attempt to rationalize his present position that he and others on the Committee were unaware of the escape with his prior statement to the Court, made during the remand hearings, that the Office was aware of it. His explanation that he originally meant only to convey that the Office as it existed decades ago knew of the escape was clearly designed to obfuscate rather than clarify. The Court finds this explanation incredible. When I originally asked that lawyer whether the Office was aware of the escape when it filed its concession, there is no logical reason why I would need to know if the Office "as an entity" and as it existed decades ago was aware of the escape. It would have taken

24

little effort for the Assistant Supervisor to clarify his answer with candor, stating, for instance, "Your Honor, I do not know whether the current Administration considered the escape when we decided to concede the death penalty, but, because an Assistant District Attorney was in the courtroom when the escape occurred in 1986, and Wharton pled guilty to escape, the Office was aware of it at that time." The Assistant Supervisor's rationalization is yet another example of a litigation practice on the part of the District Attorney's Office designed to provide the Court with only limited information that suits the Office's purposes.

Based on the foregoing, I find that the Law Division Supervisor, Assistant Supervisor and the District Attorney's Office violated Rule 11(b)(1) by asserting without "evidentiary support" or an "inquiry reasonable under the circumstances" that it had "carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfills the criteria articulated in Strickland v. Washington, 466 U.S. 668 (1984)" and that it had done so "[f]ollowing … communication with the victims' family." I also find that the violation was sufficiently "egregious" and "exceptional" under the circumstances of this case to warrant sanctions under Rule 11.

Rule 11 sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). "In determining the appropriate sanctions, the Court seeks the least significant sanction that will correct or deter similar conduct … in the future." Taggart v. Deutsche Bank Nat'l Trust Co., No. 20-cv-5503, 2021 WL 2255875, at *18 (E.D. Pa. June 3, 2021). "The sanction may include nonmonetary directives," Fed. R. Civ. P. 11(c)(4), and the Federal Judicial Conference has "expressed a preference … for nonmonetary sanctions" over monetary ones. Orlett v. Cincinnati Microwave, Inc., 954 F.2d 414, 421 (6th Cir. 1992). A wide variety of nonmonetary sanctions may be utilized. See Gaiardo v. Ethyl Corp., 835 F.2d 479, 482 (3d Cir. 1987) (listing examples).

Had the District Attorney's Office simply advised the Court of facts that would have allowed a merits review, significant judicial resources and the time and effort expended by the lawyers from the Attorney General's Office would not have been necessary.[7] The enormous cost required to uncover crucial facts that the District Attorney's Office so carelessly disregarded could suggest that monetary sanctions are necessary to deter similar conduct in the future. But the Court ultimately decides not to impose monetary sanctions here as they would fall on the taxpayers of Philadelphia and thus may not suffice to deter repetition of the conduct at issue.

In determining an appropriate nonmonetary sanction, I am guided by federal crime victims' rights legislation. "In a Federal habeas corpus proceeding arising out of a State conviction, the court shall ensure that a crime victim is afforded" certain rights, including the right not to be excluded from the proceedings, the right to be heard, and the right to be treated with dignity and respect. 18 U.S.C. § 3771(b)(2)(A). While the law directs those obligations to courts rather than prosecutors, § 3771(b)(2)(C), "courts … make decisions based on information supplied by the parties" and "must depend on the parties to provide accurate information." Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital, 185 F.3d 154, 176 (3d Cir. 1999). The District Attorney's Office's conduct in this case impeded my ability to ensure that the victims were provided their statutory rights—as well as their broader right, shared with the public generally, to have courts issue decisions "informed by knowledge of the provable facts that are likely to matter." Green, supra, at 1124.

Other than the admonition contained in this Opinion, the Court declines to impose any monetary or non-monetary sanctions on the Law Division Supervisor and Assistant Supervisor.

---

[7] The Court greatly appreciates the resources and input provided by the Attorney General's Office.

Both are public servants who were following the policies and procedures of the Office that employed them. I will however impose the following nonmonetary sanction on the District Attorney's Office under Federal Rule of Civil Procedure 11(c)(4):

First, within thirty (30) days of the filing of this opinion, the District Attorney's Office shall send separate written apologies to victim family members Tony Hart, Michael Allen, Patrice Carr, and to victim Lisa Hart-Newman for representing that it engaged in "communication with the victims' family[.]" As the testimony of the two Law Division supervisors was that the District Attorney approved and implemented internal procedures that created the need for this sanction, and that the District Attorney had the sole, ultimate authority to direct that the misleading Notice of Concession be filed, the apologies shall come from the District Attorney, Lawrence Krasner, personally. Copies of the apologies shall be filed with the Court.

Second, while I have no authority to control the conduct of the District Attorney in litigation before other judges, in cases where I am assigned, all concessions by the Philadelphia District Attorney's Office in proceedings under 28 U.S.C. § 2254 must be accompanied by a full, balanced explanation of facts that could affect my decision to accept or reject the concession. For instance, and by way of suggestion, the concession in this case could have stated:

> **"As directed by the United States Court of Appeals for the Third Circuit, and as it relates to the Sixth Amendment issue before the Court, the Capital Case Review Committee of the Philadelphia District Attorney's Office has reviewed and considered both positive and negative prison adjustment evidence. Consistent with our duty of candor and the Third Circuit's directive that anti-mitigation evidence be considered, we also advise that this evidence includes an incident in 1986 in which Mr. Wharton escaped from a City Hall courtroom. Having carefully reviewed all of the facts and law, including anti-mitigation evidence, we advise that the District Attorney's Office believes that Wharton's positive prison adjustment evidence is sufficiently mitigating to satisfy the prejudice prong of <u>Strickland</u>. The District Attorney's Office also advises that it has contacted the victims' immediate family (including the only surviving victim), and all family members are opposed to this concession."**

An appropriate order will follow.[8]

_____

[8] Local Civil Rule 83.6(V)(A) states the following:

> When the misconduct or other basis for action against an attorney (other than as set forth in Rule II) or allegations of the same which, if substantiated, would warrant discipline or other action against an attorney admitted to practice before this court shall come to the attention of a Judge of this court, whether by complaint or otherwise, and the applicable procedure is not otherwise mandated by these Rules, the judge shall refer the matter to the Chief Judge who shall issue an order to show cause.

For the reasons set forth above, this matter will be referred to the Chief Judge of this Court.