IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RYAN POWNALL : | |
| : | |
| v. : | |
| : | CIVIL ACTION NO. 22-4191 |
| LAWRENCE S. KRASNER, TRACY : | |
| TRIPP, AND THE CITY OF : | |
| PHILADELPHIA : | |

**MCHUGH, J.**                                                                                                       **June 1, 2023**

### MEMORANDUM

    This is a civil rights action brought by a former Philadelphia police officer against the District Attorney ("DA"), a prosecutor in his office, and the City of Philadelphia. Plaintiff alleges a series of improprieties in his prosecution on criminal charges after he fatally shot a fleeing suspect while on duty. The individual defendants invoke various forms of immunity as a basis to dismiss. The City argues that as a municipality it does not make policy that controls the actions of prosecutors, who act as Commonwealth officials. The law in this area is well developed, and controlling precedent requires dismissal of the case.

**I.**   **Factual Allegations**

    Plaintiff Ryan Pownall was working in his capacity as a Philadelphia police officer on June 8, 2017, when he witnessed David Jones illegally operating and recklessly driving a dirt bike. Am. Compl. ¶ 36-38, ECF 11. When Jones' bike stalled on a sidewalk, Pownall exited his vehicle and approached Jones. *Id.* ¶¶ 39-40. Based on numerous factors, Pownall believed Jones to be concealing a handgun. *Id.* ¶ 41. Pownall grabbed Jones and felt the outline of a handgun concealed in Jones' waistband. *Id.* ¶¶ 41-42. A struggle ensued, which resulted in Pownall firing at Jones. *Id.* ¶¶ 44-46. After Pownall's gun initially misfired, Pownall shot Jones. *Id.* ¶¶ 46-48. Jones was

transported to Temple University Hospital, where he was pronounced dead. *Id.* ¶ 49. Police later recovered a stolen firearm with live ammunition near the scene. *Id.* ¶ 50.

The Philadelphia DA's office commenced an investigation of Pownall's shooting of Jones, but because of a conflict of interest with then-Interim DA Kelley B. Hodge, the investigation was transferred to the Pennsylvania Office of Attorney General in July 2017. *Id.* ¶¶ 51-52. After Defendant Lawrence Krasner was sworn in as the DA of Philadelphia in January 2018, he requested the Pownall case be transferred back to the DA's office. *Id.* ¶¶ 54-57.

The DA's office submitted the matter to the Twenty-Ninth County Investigating Grand Jury to investigate the facts and circumstances surrounding Pownall's shooting of Jones. *Id.* ¶ 61. Pownall alleges that they did this despite recognizing that there was no probable cause for Pownall's arrest, and that they were motivated by Krasner's political agenda and campaign promises. *Id.* ¶ 59. Assistant District Attorney ("ADA") Tracy Tripp[1] presented the case to the grand jury. Pl.'s Ex. A at 4, ECF 11-1.

When submitting the matter to the grand jury, the DA Defendants submitted a notice "alleging that the matter in question be brought to the attention of the investigating grand jury because the *investigative resources of the grand jury are necessary for proper investigation*." Am. Compl. ¶ 62 (citing 42 Pa.C.S. § 4450(a)) (emphasis in Amended Complaint). In a later hearing, ADA Lyandra Retacco stated that the investigating grand jury was "a fact-finding vehicle" and "the functional equivalent of the investigation that a detective would do when they are creating the affidavit of probable cause." *Id.* ¶ 5 (citing Pl.'s Ex. E at 10-11, ECF 11-5).

According to the Amended Complaint, Defendant Krasner had personal knowledge, involvement, and supervision of the investigating grand jury. *Id.* ¶ 63. Pownall alleges that

---

[1] Throughout this Memorandum, I refer to DA Krasner and ADA Tripp collectively as the "DA Defendants."

Krasner directed Tripp and other employees as to what witnesses to subpoena before the grand jury, what testimony to elicit from each witness, and what legal instructions to provide to the grand jury. *Id.* ¶ 64.

According to Pownall, the DA Defendants acted in concert to obtain false and/or contradictory witness statements before the grand jury. *Id.* ¶ 67. In addition, the DA Defendants deliberately deprived the grand jury of necessary legal definitions and instructions related to the case against Pownall. *Id.* ¶ 69. Specifically, they withheld the statutory definitions for the various crimes they sought to charge Pownall with, along with the definition of the "peace officer justification defense." Pl.'s Ex. A at 7. This defense is based on Section 508 of the Pennsylvania Crime Code, 18 Pa.C.S. § 508, and sets forth circumstances in which a peace officer's use of deadly force while making an arrest is not a crime. Am. Compl. ¶ 79.

Finally, Pownall alleges that despite the DA's office's open-file discovery policy, the DA Defendants concealed exculpatory evidence throughout the investigation and grand jury process in the form of an expert report from Gregory A. Warren, Ed.D. of American Law Enforcement Training and Consulting. *Id.* ¶¶ 92-93. The DA Defendants only provided this report to Pownall and his attorney after the presiding judge ordered its production. *Id.* ¶¶ 94-95. According to Pownall, Warren's report contradicted theories that the DA Defendants advanced to the grand jury tribunal, and it proved that there was no probable cause to charge Pownall criminally. *Id.* ¶ 96. Pownall alleges that these actions were taken pursuant to DA's office procedures with the intent to abuse the investigative powers of the grand jury by intentionally and deliberately violating Pownall's constitutional rights and depriving him of his due process and equal protection rights. *Id.* ¶¶ 65-66, 97-98.

The grand jury issued its presentment recommending that the DA institute criminal proceedings against Pownall and charge him with the following offenses:

1. Criminal Homicide, 18 Pa.C.S.A. § 2501;

2. Possession of an Instrument of Crime, 18 Pa.C.S.A. § 907; and

3. Recklessly Endangering Another Person, 18 Pa.C.S.A. § 2705.

*Id*. ¶ 69.  The DA Defendants thereafter charged Pownall with the murder of Jones.  *Id*. ¶ 70.  They then filed a motion to bypass a preliminary hearing, allegedly supported by provided the presiding judge with incorrect case law.  *Id*. ¶¶ 3, 71; Pl.'s Ex. A at 10.  They also successfully moved to unseal the grand jury's presentment and brought the attention of the press to the grand jury's factual findings, allegedly with knowledge that the story would be covered by local and national news to further Defendant Krasner's political agenda.  Am. Compl. ¶ 72.

The case was then assigned to the Honorable Barbara A. McDermott, who scheduled it for a trial in early January 2020.  *Id*. ¶ 73.  The DA Defendants successfully fought to keep the trial before a Philadelphia jury, allegedly in order to "stack the deck" and secure Pownall's conviction.  *Id*. ¶ 74.

In late November 2019, roughly a month before the trial was set to begin, the DA Defendants filed a motion *in limine* seeking to bar the use of the standard jury instruction for the "peace officer justification defense" based on Section 508 of the Pennsylvania Crime Code.  *Id*. ¶ 79.  The DA Defendants argued that Section 508 violated the Fourth Amendment to the United States Constitution.  *Id*. ¶ 80.

In December 2019, Pownall filed a motion to quash the grand jury presentment.  *Id*. ¶ 81.  The DA Defendants did not respond to that motion, and instead made an unscheduled appearance before the court, demanding that it rule on the DA Defendants' motion *in limine*.  *Id*.  The DA

Defendants also warned the trial court that they would pursue an interlocutory appeal of any order denying the motion, regardless of whether the court gave permission for such an appeal. *Id*. ¶ 82.

After the court denied the motion *in limine*, the DA Defendants filed their interlocutory appeal. *Id*. ¶ 83. In the appeal, the DA Defendants certified that the trial court's denial of their motion *in limine* would terminate or substantially hinder their case against Pownall, allegedly revealing that they understood that the applicability of Section 508 would negate any probable cause for Pownall's arrest. *Id*. ¶ 84.

During the pendency of the appeal, an episode of a television documentary series titled "Philly D.A." aired on PBS. *Id*. ¶ 14. The episode featured a meeting at the DA's office between Defendant Tripp and the Jones family. *Id*. ¶ 85. Tripp read the Jones family information about Section 508 of the Pennsylvania Crime Code, after which the following exchange took place:

> **Family**: There is a piece in there, that you, that you kind of said it I'm like ya'll that gives them too much freedom.
>
> **Tripp**: Right. Because it basically says you're allowed to shoot them in the back when they're running away. If you think they've got a gun, you can shoot them in the back. I think that is a little crazy.

*Id*. Pownall alleges that Tripp's participation in this documentary was part of an "extrajudicial PR campaign," which "served no legitimate law enforcement purpose and served only to 'poison the well of public opinion.'" *Id*. ¶ 90 (quoting Pl.'s Ex. B at 17 n.13, ECF 11-2).

The appeal of the motion *in limine* eventually reached the Pennsylvania Supreme Court, which held that the interlocutory appeal was not permissible. Pl.'s Ex. A at 3. In a concurring opinion, Pennsylvania Supreme Court Justice Dougherty expressed his concern about the manner in which the DA's office had pursued its prosecution of Pownall, and specifically for "(1) its failure to provide the investigating grand jury with all relevant legal definitions; (2) its successful attempt

to deny Pownall a preliminary hearing; and (3) its relentless but unsuccessful attempt to change the peace officer justification law prior to Pownall's trial." Pl.'s Ex. B. at 2-3.

Following the resolution of the appeal, Judge Barbara McDermott published a Statement of Findings of Fact and Conclusions of Law pertaining to Pownall's motion to quash the grand jury's presentment. Pl.'s Ex. A. Judge McDermott held that "[t]he Commonwealth committed multiple errors throughout the Grand Jury process that prejudiced the Defendant." *Id*. at 7. Specifically, "the Commonwealth failed to provide the Grand Jury with the statutes for First-Degree Murder, Third-Degree Murder, Voluntary Manslaughter, and Involuntary Manslaughter." *Id*. It "also failed to fulfill its prosecutorial duties by deciding not to advise the Grand Jury about the justification defense under Section 508." *Id*. Judge McDermott stated that "[t]hese errors could have been cured by a preliminary hearing, but the Commonwealth denied the Defendant this right by filing a Bypass Motion." *Id*. at 9. She added that the Commonwealth was disingenuous when asserting that it had good cause to bypass the preliminary hearing, and that it demonstrated a lack of candor in its hearing on the bypass motion by misstating the law and providing the presiding judge with incorrect case law. *Id*. at 10. Judge McDermott quashed the presentment after determining that Pownall's due process rights had been violated. *Id.* at 11-12. Simultaneously, however, she also noted that the "decision to quash the presentment does not bar the Commonwealth from rearresting [Pownall] on the same or similar criminal charges as . . . any prejudice suffered by [Pownall] can be cured by providing him with a preliminary hearing." *Id.* at 12.

**II.     Standard of Review**

Within the Third Circuit, motions to dismiss under Fed. R. Civ. P. 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

**III.    Discussion**

      **A. The DA Defendants' Actions Before the Grand Jury and During the Prosecution of Pownall Are Shielded by Absolute Immunity.**

Pownall brings claims against the DA Defendants for their conduct related to the investigating grand jury and his subsequent prosecution. The DA Defendants contend that their actions surrounding the grand jury process and during the following criminal proceedings are protected by absolute immunity.

When determining whether a prosecutor's actions are protected by absolute immunity, courts "focus upon the functional nature of the activities rather than [the prosecutor's] status." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). The Third Circuit has explained that "[a]nalysis of prosecutorial immunity questions thus has two basic steps, though they tend to overlap. The court must ascertain just what conduct forms the basis for the plaintiff's cause of action, and it must then determine what function (prosecutorial, administrative, investigative, or something else entirely) that act served." *Schneyder v. Smith*, 653 F.3d 313, 332 (3d Cir. 2011). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991).

The so-called "functional test separates advocacy from everything else, entitling a prosecutor to absolute immunity only for work 'intimately associated with the judicial phase of the criminal process.'" *Fogle v. Sokol*, 957 F.3d 148, 159-60 (3d Cir. 2020) (quoting *Burns*, 500 U.S. at 486). In contrast with a prosecutor's advocacy related to the judicial phase of the criminal

process, a "prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

Analytically, Pownall's claims can be divided into allegations about conduct after the grand jury issued its presentment and conduct before its issuance. As to post-presentment conduct, Pownall takes issue with the following:

1. Defendants' motion to bypass a preliminary hearing, in which they allegedly provided the presiding judge with incorrect case law. Am. Compl. ¶ 71; Pl.'s Ex. A at 10.

2. Defendants' motion to unseal the grand jury presentment. Am. Compl. ¶ 72.

3. Defendants' efforts to keep the trial before a Philadelphia jury. *Id.* ¶ 74.

4. Defendants' motion *in limine* to depart from the standard jury instruction for the peace officer justification defense. *Id.* ¶ 77.

5. Defendants' allegedly improper appeal of the court's denial of its motion *in limine*. *Id.* ¶¶ 82-84.

Pownall provides no arguments or authority suggesting that these post-grand jury actions fall outside of the scope of absolute immunity. Nor could he. These actions were all "intimately associated with the judicial phase of the criminal process," *Imbler*, 424 U.S. at 430, and "require[d] legal knowledge and the exercise of related discretion." *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009). Because the DA Defendants were acting as "officer[s] of the court" when taking the above actions, those actions are protected by absolute immunity regardless of their propriety or lawfulness. *Imbler*, 424 U.S. at 431 n.33.

I turn now to the question of whether the same immunity extends to the DA Defendants' conduct preparing for and presenting to the grand jury. The Third Circuit has repeatedly addressed whether the process of submitting a case to a grand jury falls within the prosecutor's advocacy or investigatory functions. And in each of these cases, the Third Circuit has provided the same answer: when prosecutors are preparing and presenting their case to a grand jury, they are acting as advocates and entitled to absolute immunity. *See Rose v. Bartle*, 871 F.2d 331, 344 (3d Cir. 1989) ("The plaintiffs' allegations involve direct solicitations of testimony for use in the grand jury proceedings. Such solicitations are encompassed within 'the preparation necessary to present a case' and therefore are immunized as involving the prosecutors' advocacy functions."); *Kulwicki v. Dawson*, 969 F.2d 1454, 1465 (3d Cir. 1992); *Fogle*, 957 F.3d at 160. The Supreme Court has provided the same answer. *See Burns*, 500 U.S. at 490 n.6 ("There is widespread agreement among the Courts of Appeals that prosecutors are absolutely immune from liability under § 1983 for their conduct before grand juries."); *Imbler*, 424 U.S. at 431 n.33.[2]

In addition to these general statements of immunity before a grand jury, case law makes clear that the specific actions that Pownall takes issue with are all protected by absolute immunity. Pownall alleges that the DA Defendants solicited false testimony before the grand jury. Am. Compl. ¶ 17. But the Third Circuit has held that "soliciting false testimony from witnesses in grand jury proceedings . . . is absolutely protected." *Kulwicki*, 969 F.2d at 1465 (citing *Burns*, 500 U.S. at 485-90). In fact, "[e]ven interviews generating evidence to be presented to a grand jury are absolutely protected." *Id*. (citing *Rose*, 871 F.2d at 344). Pownall challenges the DA Defendants' alleged withholding of an exculpatory draft expert report and legal definitions and

---

[2] As discussed further below, the Court refused to apply absolute immunity to the fabrication of false evidence in *Buckley*, but in that case, "[i]t was well after the alleged fabrication of false evidence . . . that a special grand jury was empaneled." 509 U.S. at 275.

9

instructions from the grand jury, Am. Compl. ¶¶ 69, 92-96, but the Supreme Court has rejected any distinction between "willful use . . . of perjured testimony" and "the deliberate withholding of exculpatory information" when determining whether absolute immunity applies. *Imbler*, 424 U.S. at 431 n.34.  And to the extent that Pownall challenges the decision to present the case to the grand jury in the first place, the Supreme Court has stated that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom. . .  includ[ing] questions of whether to present a case to a grand jury." *Id.* at 431 n.33.

In seeking to overcome the overwhelming weight of this case law, Pownall seizes upon language used by the DA's office in the criminal proceedings that suggests that the investigating grand jury was a "fact-finding vehicle" and "the functional equivalent of the investigation that a detective would do."  Am. Compl. ¶ 5 (quoting Pl.'s Ex. E at 10-11).  But an individual prosecutor's characterization of grand jury proceedings cannot supplant the functional analysis established by the Supreme Court and applied by the Third Circuit in determining whether a prosecutor's activity before a grand jury is entitled to absolute immunity.  *See Rose*, 871 F.2d at 345 ("The mere invocation of the catch-word 'investigatory' . . . cannot suffice in this case to forestall dismissal on immunity grounds."); *see also Zimmerman v. Corbett*, No. 1:13-CV-02788, 2015 WL 539783, at *7 n.8 (M.D. Pa. Feb. 10, 2015) ("Presenting the state's case before Pennsylvania's grand jury is not analogous to the investigative functions normally performed by detectives and police officers.  Rather, it is uniquely prosecutorial and within the realm of activity protected by absolute immunity.") (cleaned up).  Similarly, the specific powers afforded to a Pennsylvania investigating grand jury do not change the analysis. *Zimmerman*, 2015 WL 539783, at *7 ("That a Pennsylvania grand jury merely has the power to recommend charges, rather than

to indict, is irrelevant; the function of the prosecutor in either scenario is the same: to present the state's case and evidence."). Pownall's attempt to leverage the statements of the DA's office therefore falls short of altering the immunity analysis.

Finally, Pownall relies on *Fogle v. Sokol,* seeking to draw a distinction between a prosecutor's conduct before they have probable cause for an arrest and a prosecutor's conduct once it has been established. 957 F.3d at 160. He seizes upon the *Fogle* court's quotation of *dicta* from *Buckley*, where the Supreme Court stated that "[b]efore probable cause for an arrest, a prosecutor's 'mission at that time [i]s entirely investigative in character.'" *Id.* at 160 (quoting *Buckley*, 509 U.S. at 274). According to Pownall, every case holding that actions before a grand jury are protected by absolute immunity involved grand juries convened *after* there was probable cause for an arrest. Here, he argues, the situation is different because the grand jury was convened to investigate Pownall's actions *before* there was probable cause for an arrest. But the case law does not support such a distinction.

As an initial matter, *Fogle* itself embraced a broad scope of immunity, stating that "prosecutors are immune from claims arising from their conduct in beginning a prosecution, including 'soliciting false testimony from witnesses in grand jury proceedings.'" *Id.* at 160 (quoting *Kulwicki*, 969 F.2d at 1465) (internal citations omitted). *Fogle* does not qualify this statement in any manner, and it cannot be said that it implicitly overruled the line of Third Circuit decisions recognizing absolute immunity for conduct before a grand jury.

Other Third Circuit case law fails to support Pownall's distinction based on probable cause. In *Rose*, the prosecutor did not swear out a criminal complaint or an affidavit of probable cause until after "the grand jury returned a second presentment recommending charges against [the criminal defendants]." 871 F.2d at 336. In that respect, *Rose* is directly analogous to the present

11

case. Moreover, the *Rose* court explicitly held that "alleged solicitations of perjury" were subject to absolute immunity because they "occurred in preparation for the grand jury proceedings, not in an investigatory capacity." *Id*. at 345. Pownall himself relies on *Rose* in his briefing, but the facts of *Rose* stand firmly in the way of his argument that the existence of probable cause is a prerequisite to absolute immunity.

I also note that the language in *Fogle* on which Pownall relies is a quote from the Supreme Court's decision in *Buckley*. But the facts in *Buckley* were far different. The claim was one for fabrication of evidence, and the Supreme Court concluded that the fabrication was too remote in time from the grand jury process to trigger prosecutorial immunity: "[i]t was well after the alleged fabrication of false evidence . . . that a special grand jury was empaneled." 509 U.S. at 275. In contrast, the allegations here involved misconduct leading up to and *during* grand jury proceedings. The actions of the DA Defendants were therefore intimately connected to the judicial process and as such are protected by absolute immunity.

Because I conclude that Krasner and Tripp are absolutely immune for their judicial advocacy in prosecuting Pownall, it follows that absolute prosecutorial immunity extends to Krasner's supervision and training of Tripp and other agents on matters related to that advocacy. *See Van de Kamp*, 555 U.S. at 344-49 (holding that, while absolute immunity typically does not extend to purely administrative tasks, it *does* apply when the administrative task—such as supervision or training—is directly connected with a prosecution). Counts I and II will therefore be dismissed to the extent that they seek to hold the DA Defendants liable for their judicial advocacy surrounding grand jury proceedings and the subsequent prosecution of Pownall, or involve the training and supervision of ADAs in matters related to that prosecution.

**B. The DA Defendants' Statements to the Press, Including Defendant Tripp's Statements in the "Philly D.A." Television Show, Are Shielded by Qualified Immunity.**

Pownall also takes issue with Defendant Tripp's comments to the Jones family, which were captured on the "Philly D.A." documentary, along with other unspecified statements made to the press. "Talking to the press is, at best, only an administrative function," and is therefore protected only by qualified immunity. *See Schrob v. Catterson*, 948 F.2d 1402, 1420 (3d Cir. 1991).

Qualified immunity protects officials from claims for monetary damages "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). In his Amended Complaint, Pownall did not identify any right violated by comments to the press. In his response brief and at oral argument, Pownall argued that the DA Defendants' statements to the press and participation in the "Philly D.A." documentary violated his clearly established right to a fair trial under the Sixth Amendment by "poisoning the well" of potential jurors against him. Putting to one side that Pownall did not plead a Sixth Amendment claim in his Amended Complaint, it is well established that there can be no violation of the Sixth Amendment right to a fair trial when there has been no trial or when the charges against a defendant were dismissed, as happened here. *See, e.g., Anderson v. Venango Cnty., Pa.*, No. CA 10-79, 2011 WL 147907, at *8 (W.D. Pa. Jan. 18, 2011), *aff'd*, 458 F. App'x 161 (3d Cir. 2012) (holding that a Sixth Amendment right to a fair trial claim is "subject to dismissal on the independent basis that [plaintiff] was never tried following the allegedly improper prosecutorial conduct"); *Hensley v. Carey*, 818 F.2d 646, 649 (7th Cir. 1987) (plaintiff "could not possibly have been deprived of his right to a fair trial since he was never tried"); *Rogala v. D.C.*, 161 F.3d 44, 56 (D.C. Cir. 1998) ("In the absence of a criminal trial, there was no defense to be prejudiced by the unavailability of

bystanders to testify or by the absence of Ms. Rogala's testimony. Plaintiffs therefore have failed to establish a deprivation of their Fifth or Sixth Amendment rights.") (internal citations omitted); *Price v. Roberts*, No. CIV.A. 10-1574, 2011 WL 1877823, at *13 (W.D. Pa. May 16, 2011) ("[W]hether this case is analyzed as a situation in which Plaintiff was not brought to trial at all or one in which the 'trial' resulted in the charges being dismissed, she cannot state a Sixth Amendment claim for denial of a fair trial based on the facts alleged herein."); *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999) ("In . . . cases [where] all criminal charges were dismissed prior to trial . . . courts have held universally that the right to a fair trial is not implicated and, therefore, no cause of action exists under § 1983."). Having failed to plead a violation of a constitutional right, let alone a clearly established right, Pownall's claims against the DA Defendants related to their statements to the press must be dismissed.

### C. The DA Defendants Are Shielded from Pownall's State Law Claim by the Common Law Doctrine of High Public Official Immunity.

Finally, the DA Defendants move to dismiss Plaintiff's claim for "malicious and outrageous" conduct. Plaintiff does not define this claim further, but it presumably is a claim under Pennsylvania state law. The DA Defendants correctly argue that they are protected from this state law claim under the common law doctrine providing that "high public officials are immune from suits seeking damages for actions taken or statements made in the course of their official duties." *Durham v. McElynn*, 565 Pa. 163, 165 (2001). The Pennsylvania Supreme Court has explicitly extended such protections to prosecutors performing their official duties. *Id.* at 167.

Pownall offers no response to this defense, and because the DA Defendants are absolutely immune under state law, Pownall's malicious and outrageous conduct claim will be dismissed with prejudice.[3]

### D. The City of Philadelphia Is Not Liable Under *Monell v. Department of Social Services*.

In addition to Pownall's claims against the DA Defendants, he asserts federal claims against the City of Philadelphia. To hold a municipality liable under *Monell v. Department of Social Services*, a plaintiff must allege that "a [local] government's policy or custom . . . inflict[ed] the injury" in question. 436 U.S. 658, 694 (1978). The Third Circuit has explained that "[p]olicy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Estate of Roman v. City of Newark*, 914 F.3d 789, 789 (3d Cir. 2019) (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990)). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). To sustain a *Monell* action against a municipality based on a municipal custom, a plaintiff must show that "policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury." *Bielevicz*, 915 F.2d at 851.

---

[3] Defendants separately argue that they are statutorily immune under the Pennsylvania Political Subdivision Claims Act. Although that statute provides an exception for willful misconduct, 42 Pa.C.S.A. § 8550, the Third Circuit had held that this provision does not abrogate the absolute immunity otherwise conferred on public officials under state common law. *See Heller v. Fulare*, 454 F.3d 174, 178 n.2 (3d Cir. 2006) ("To the extent that the doctrine is applied to those designated as 'high public officials,' it has indeed survived despite the statute's limitations as to other employees. Accordingly, the district court opinions, to the extent that they express doubt as to the continued vitality of Pennsylvania's common law high public official immunity, are not correct.") (internal citations omitted); *see also Durham*, 565 Pa. at 165.

Pownall alleges that the following policies, procedures, customs, and/or practices were created by Defendants:

1. illegally withholding *Brady* evidence from the investigating grand jury and its supervising judge;
2. intentionally and deliberately misleading the investigating grand jury and the tribunal;
3. intentionally and deliberately depriving the grand jury of necessary and applicable legal instructions based upon constitutional Pennsylvania statutes and laws;
4. intentionally and deliberately offering public comment to poison potential jurors in violation of Rules of Professional Conduct 3.3 and 3.8;
5. having a policy and procedure to target peace officers as a function of furthering its own political agenda;
6. intentionally and deliberately depriving criminal defendants of due process and constitutional rights;
7. intentionally and deliberately departing from well-established internal practices and procedures for sound criminal investigations before the investigating grand jury which were designed to promote fairness and equality;
8. failing to intervene at reasonable and realistic opportunities in the investigative grand jury; and
9. failing to supervise the investigative grand jury process to ensure that Pownall's constitutional rights were not violated and that he was treated the same as others.

Am. Compl. ¶ 130. Except for the alleged practice connected to offering public comment to poison potential jurors, these allegations all concern distinctly prosecutorial conduct.

> *i. Defendant Krasner Is Not a Local Policymaker When Prosecuting Crimes, Including During Grand Jury Proceedings*

*Monell* requires a plaintiff to identify a municipal policymaker with final authority whose actions can be attributed to the City of Philadelphia. Here, Pownall identifies DA Krasner as that policymaker, [4] and the question is whether Krasner fits that definition. [5]

The Third Circuit has explained that DAs are "local policy makers when they manage or administer their own offices," but that they are "State officials when they prosecute crimes or otherwise carry out policies established by the State." *Carter v. City of Phila.*, 181 F.3d 339, 352 (3d Cir. 1999). As a result, to the extent that Pownall seeks to impose liability on the City for any alleged municipal policies or customs pertaining to his prosecution, such claims necessarily fail for the lack of a *municipal* policymaker. *See Williams v. Fedor*, 69 F. Supp. 2d 649, 660-61 (M.D. Pa. 1999), *aff'd*, 211 F.3d 1263 (3d Cir. 2000) ("Williams' first theory of liability against Monroe County must fail because its major premise—that District Attorney Gregor acts as a county policymaker when acting in his prosecutorial capacity—is without merit."); *Whitfield*, 587 F. Supp. 2d at 671 ("Importantly, when prosecuting crimes or 'otherwise carry[ing] out policies established by the State,' prosecutors are in fact acting as state officials. It is only when making administrative decisions that a prosecutor is acting as a county official. Thus, a municipality can only be held liable for the acts of its officials undertaken in an administrative capacity.") (internal citations omitted). And because, as explained above, the prosecution of Pownall includes the

---

[4] "[C]ourts in this district have routinely held that Assistant District Attorneys [such as Defendant Tripp] cannot be policy makers for Section 1983 purposes because they lack unreviewable discretion as a matter of law." *Whitfield v. City of Phila.*, 587 F. Supp. 2d 657, 671 (E.D. Pa. 2008). As a result, Tripp's actions cannot be directly imputed to the City under *Monell*. Pownall does not argue to the contrary.

[5] The City also argues that Pownall lacks standing to sue it because Pownall does not allege any harm that is "fairly traceable" to the City. But this argument rests on the same basic premise as the City's *Monell* argument: that Krasner was not a municipal policymaker for any of the relevant actions such that his actions could be imputed to the City. I will therefore not separately address the City's standing argument here.

investigating grand jury proceeding, the City cannot be separately liable for any alleged policy or custom pertaining to such prosecutorial advocacy.

> ii. *Defendant Krasner Is Not a Local Policymaker When Training or Supervising Others in the Prosecution of Crimes*

Relatedly, the City cannot be held liable for any alleged failure to train or supervise Tripp or other DA staff in prosecutorial matters. In certain instances, training and supervision qualify as administrative, rather than prosecutorial functions. *See Carter*, 181 F.3d at 352-53. When a DA's training or supervision is truly administrative, the DA acts as a local policymaker whose actions could be attributed to the municipality under *Monell*. *See id.*; *Whitfield*, 587 F. Supp. 2d at 671. But training and supervisions of ADAs to perform as lawyers is rightly considered prosecutorial, rather than administrative. As a result, Krasner's alleged failure to properly train or supervise ADAs in their prosecutorial role cannot be imputed to the City.

In *Van de Kamp v. Goldstein*, the Supreme Court drew a distinction between administrative duties concerning functions such as "workplace hiring, payroll administration, the maintenance of physical facilities," which are far removed from the prosecutorial function, and duties that are "directly connected with the conduct of a trial" and that "require legal knowledge and the exercise of related discretion." 555 U.S. 335 at 344-45. It held that absolute immunity extends to "'faulty training' claim[s] . . . [that] rest[] in necessary part upon a consequent error by an individual prosecutor in the midst of trial," largely because it deemed the relevant management tasks to be "directly connected with the prosecutor's basic trial advocacy duties." *Id.* at 346-47. *Van de Kamp* did not directly address municipal liability. But because Pownall's municipal liability claim concerns DA Krasner's supervision and training of ADAs in their basic advocacy duties, I am confident that its logic applies in this context as well, and that "in making direct prosecutorial decisions in the courtroom, and in training subordinates to do the same, a district attorney is a *state*

18

actor." *Wallace v. Powell*, No. CIV.A.3:09-CV-0291, 2010 WL 785253, at *6 (M.D. Pa. Mar. 1, 2010) (Caputo, J.) (emphasis in original).

The Third Circuit's decision in *Carter v. City of Philadelphia* does not warrant a different outcome. *Carter* concerned a DA's supervision of municipal police officers, and the DA's training of ADAs to themselves supervise municipal police officers. 181 F.3d at 342-43, 351-52. As the Third Circuit stated, "it involve[d] local policies relating to training, supervision and discipline, rather than decisions about whether and how to prosecute violations of state law." *Id*. at 353. I agree with Judge Caputo that *Carter* held only that a "district attorney was a municipal actor where they supervised *municipal officials* and instructed others to do the same." *Wallace*, 2010 WL 785253, at *5 (emphasis in original). As with the DA in *Wallace*, Krasner here supervised ADAs on "prosecutorial acts [that] would be state acts if taken directly by the district attorney." *Id*. To deem a DA a local policymaker in such a context would "create[e] the anomalous result of requiring a county actor train a state actor on how to perform a state prosecutorial function." *Id*. Krasner's supervision and training of Tripp and other ADAs pertaining to the prosecution of Pownall was a prosecutorial—and therefore State—function, rather than an administrative, municipal one, for which the City cannot be held liable.

> iii. *The City Cannot Be Held Liable for Public Comments to Poison Potential Jurors, Because There Is No Constitutional Injury*

Finally, Pownall identifies a policy or custom to "intentionally and deliberately offer[] public comment to poison potential jurors in violation of the Rules of Professional Conduct, 3.3 and 3.8." Am. Compl. ¶ 130. To prevail under *Monell,* a plaintiff must identify a "'plausible nexus' or 'affirmative link' between the municipality's [policy or] custom and the specific deprivation of constitutional rights at issue." *Bielevicz*, 915 F.2d at 850 (quoting *Estate of Bailey by Oare v. County of York*, 768 F.2d 503, 507 (3d Cir.1985) and *City of Okla. City v. Tuttle*, 471

19

U.S. 808, 823 (1985)).  As discussed above, there can be no deprivation of the constitutional right to a fair trial when charges were dismissed before trial, as is the case here.  Consequently, at this point there can be no municipal liability for the alleged attempt to "poison the well" of potential jurors.

IV. **Conclusion**

For the reasons set forth above, Defendants' Motions to Dismiss will be granted.  Plaintiff's claims based on the grand jury proceedings and criminal prosecution of Pownall will be dismissed as to all Defendants, with prejudice.  Plaintiff's claims based on statements to the press, including statements captured in the "Philly D.A." television show, will be dismissed without prejudice should renewed criminal charges against Pownall proceed to trial.[6]  An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge

---

[6] I am hard pressed to see how Plaintiff could plausibly plead that any statements to the media so remote in time gives rise to a Sixth Amendment claim, but that issue is not before me.